## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| FIRESTONE LASER & MANUFACTURING LLC, | CASE NO. 4:21-CV-01772-AMK |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| MICHAEL BRISTOW, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Pending before the Court is a Motion for Summary Judgment ("Motion") filed by Plaintiff Firestone Laser & Manufacturing, LLC ("Firestone") pursuant to Federal Rule of Civil Procedure 56.  (ECF Doc. 52.)  Defendant Michael Bristow ("Mr. Bristow"), proceeding pro se, did not file a brief in opposition the Motion.  For the reasons set forth below, the Court finds Mr. Bristow individually liable, **GRANTS** the Motion as to Counts Two (quantum meruit) and Four (breach of contract), **DENIES** the Motion as to Count Five (account), and awards damages in the amount of $344,912.32.  Firestone's alternate claims for relief are disposed of as outlined below.

## I.      Background

### A.      Procedural History

This action was removed from state court in September 2021.  (ECF Doc. 1.)  Firestone filed a First Amended Complaint on February 4, 2022.  (ECF Doc. 14 ("Complaint").)  The Complaint asserts claims against Mr. Bristow individually and as a dba for "Bristow Beds." (Complaint, p. 1.)  Firestone seeks recovery for engineering and design services for a custom truck bed in Counts One (breach of contract), Two (quantum meruit), and Three (unjust

enrichment), and payment for five custom truck beds in Counts Four (breach of contract) and Five (account). (Complaint, pp. 2-6, ¶¶ 8-40.) Mr. Bristow filed an Answer on February 18, 2022. (ECF Doc. 15 ("Answer").) In his Answer, Mr. Bristow asserts that both defendants—Michael Bristow and "Michael Bristow dba Bristow Beds"—are the same person. (Answer, p. 1.) However, he also asserts that he did not personally do business as Bristow Beds (*id.*) and that "'Bristow Beds' is a registered fictitious name of non-party Big Hat Investments, LLC and is the business name used by that entity" (*id.*, p. 2, ¶ 2).

Through counsel, Mr. Bristow filed a Motion for Judgment on the Pleadings in May 2022 (ECF Doc. 18), arguing that Firestone failed to plead sufficient facts to establish that he could be held personally liable, asserting that he was acting at all times as an agent of corporate principal Big Hat Investments, LLC ("Big Hat") (*id.* at p. 1). This Court denied the Motion (ECF Doc 29), finding the Complaint alleged sufficient facts to support a reasonable inference that Mr. Bristow could be subject to personal liability under Ohio law (*id.* at p. 10).

Mr. Bristow's counsel subsequently moved to withdraw from the case. (ECF Docs. 33, 36.) That motion was granted on December 27, 2022. (ECF Doc. 37.) Mr. Bristow was advised of his rights and elected to proceed pro se thereafter. (ECF Doc. 36, p. 2; ECF Doc. 37.)

The matter was referred for mediation before U.S. Magistrate Judge Carmen E. Henderson in April 2023 (ECF Doc. 47), but Mr. Bristow was held in civil contempt for violating court orders relating to the mediation process in June 2023 (ECF Doc. 55; *see also* Non-Document Orders of June 27 & 29, 2023).

Firestone filed the instant Motion on May 30, 2023, seeking summary judgment on Counts Two, Four, and Five of the Complaint. (ECF Doc. 52.) Specifically, Firestone asserts that Bristow should be held personally liable for: (1) $254,912.32 in engineering and design

services under Count Two (quantum meruit); (2) the $90,000 purchase price for five custom truck beds under Count Four (breach of contract); and (3) the same $90,000 purchase price under the Count Five (unpaid account).  (*Id.* at pp. 2-17.)  Firestone does not address the Counts One (breach of contract) or Three (unjust enrichment) in the Motion.   Mr. Bristow, proceeding pro se, did not file a brief in opposition to the Motion or submit any relevant evidence.

## B.    Factual Background

In February of 2019, Mr. Bristow contacted Firestone to inquire about the potential for Firestone to manufacture custom forklift truck beds.  (ECF Doc. 52-1 ("Fryda Aff."), p. 1, ¶ 2.)  Mr. Bristow described these custom beds as "Bristow Beds."  (*Id.*)  Mr. Bristow attended several meetings with Firestone personnel, including Firestone President, Rick Fryda.  (*Id.* at ¶¶ 1, 3.)  Bristow also toured Firestone's facilities.  (*Id.* at ¶ 3.)  The parties then reached an agreement for Firestone to manufacture Bristow Beds for purchase by Bristow.  (*Id.*)

### 1.    Engineering and Design Work by Firestone

Bristow provided Firestone with forklift truck bed design plans (hereinafter "Prints") in April 2019, in addition to a prototype of a Bristow Bed.  (Fryda Aff., p. 1, ¶ 4; ECF Doc. 52-2 ("Hank Aff.), p. 1, ¶ 2; ECF Doc. 52-2, pp. 4-102.)  But when Firestone laser cut the parts according to the exact lines set out in the Prints, almost none of the parts fit together so that the Bristow Bed could be assembled; necessary slots and mounting holes were missing and tolerances (the amount dimensions could vary) were missing or incorrect.  (Hank Aff., p. 1, ¶¶ 4-5.)  The Prints also lacked key components, locations for components, and critical and essential dimensions, and there were no assembly prints, no electrical drawings, no specifications for routing hydraulic or electrical lines, and no specifications for lighting.  (*Id.* at ¶ 4.)  It became clear to Firestone that the forklift truck bed could not be produced from the Prints.  (Fryda Aff.,

p. 1, ¶ 5; Hank Aff., pp. 1-2, ¶¶ 2-5.)  Further, while the prototype supplied by Mr. Bristow was a functional prototype, it was "nowhere near a final production unit."  (Hank Aff., p. 1, ¶ 2.)

To manufacture the Bristow Bed, Firestone committed two of its engineers, Sam Hank and Tyler Pagley, to work exclusively on engineering and design to enable production.  (Hank Aff., p. 2, ¶ 6; Fryda Aff., p. 1, ¶ 6.)  Other Firestone engineers working on the project included David Mendenhall and Wally Hank.  (Fryda Aff., p. 1, ¶ 6.)  Sam Hank and Tyler Pagley redesigned and recut over 100 truck bed parts to create a functioning forklift truck bed.  (Hank Aff., p. 2, ¶ 6.)  The resulting design and prototype had almost no parts that were identical to the prototype originally provided by Mr. Bristow.  (Hank Aff., p. 2, ¶ 6.)  The new design amounted to "essentially a complete reengineering of the entire lift assembly and the correct positioning of that mechanism so that it would actually work."  (*Id.* at ¶¶ 7-8; *see* ECF Doc. 52-2, pp. 103-110 (examples and explanations depicting Firestone's redesign process).)  Without this redesign and reengineering, it was not possible for the lift assembly depicted in the Prints to function correctly, or at all.  (Hank Aff., p. 2, ¶ 8.)  Redesign of crucial lift bed components such as the "headache rack" and the design of a wiring harness are other examples of important redesign work completed by Firestone.  (*Id.* at pp. 2-3, ¶¶ 9-10.)

Firestone built a prototype from its new design, which Mr. Bristow took back to Missouri.  (Fryda Aff., p. 1, ¶ 8.)  The first prototype was unsuccessful, but Firestone then built a second, successful prototype.  (*Id.*)  After building the second prototype, Firestone produced a complete set of prints ("New Prints") based on that prototype from which a fully functional Bristow Bed could be manufactured.  (*Id.* at ¶ 9; Hanks Aff., pp. 2-3, ¶¶ 7-11.)

Mr. Bristow was kept apprised of, and engaged in discussions about, the engineering and design work being done in service of manufacturing the Bristow Bed.  (Hanks Aff., p. 3, ¶ 13.)

4

Mr. Bristow was in "constant contact" via email and text with Firestone engineers throughout the engineering and design process.  (*Id.*; *see* ECF Doc. 52-2, pp. 120-143 (emails dated 10/25/19, 10/31/19, 11/6/19, and 1/4/20).)

Firestone submitted the New Prints to Mr. Bristow for his review.  (Fryda Aff., p. 2, ¶ 10; Hank Aff., p. 3, ¶ 12.)  The New Prints also needed to be reviewed by a professional engineer, and Mr. Bristow directed Firestone to send them to engineer Joel Jacobson.  (Fryda Aff., p. 2, ¶ 11.)  In an email dated November 13, 2019, Mr. Bristow forwarded communications from Mr. Jacobson to Sam Hank and Tyler Pagley and asked them to contact Mr. Jacobson directly to address his questions.  (Hank Aff., p. 3, ¶ 12; ECF Doc. 52-2, pp. 116-118.)  In an email dated February 12, 2020, Mr. Jacobson advised Firestone engineers Sam Hank, Tyler Pagley, and Wally Hank that his contract and statement of work with Mr. Bristow made him "essentially part of [Mr. Bristow's] technical staff until October" and that "any future requests from [Mr. Jacobson] should be considered the same as if Mr. Bristow is making them."  (Hank Aff., p. 3, ¶ 12; ECF Doc. 52-2, p. 119.)   A complete set of the New Prints, containing Firestone's signature block, was sent to Mr. Jacobson for review.  (Fryda Aff., p. 2, ¶ 11; Hank Aff., p. 3, ¶ 12.)  Mr. Jacobson required Firestone to remove its signature block from the New Prints, stating that "he could not sign-off on the prints so long as they contained Firestone's signature block."  (Fryda Aff., p. 2, ¶ 11.)  The New Prints were ultimately approved by Mr. Jacobson.  (*Id.* at ¶ 13.)

The New Prints sent to Mr. Bristow and Mr. Jacobson were the result of 3016 hours of engineering and design services by Firestone engineers, for which Firestone's customary hourly rate is $84.52, for a total value of $254,912.32.  (Fryda Aff., p. 2, ¶ 12; *see* ECF Doc. 52-1, p. 5.)  Firestone also purchased necessary components and made production fixtures to manufacture the Bristow Bed.  (Fryda Aff., p. 1, ¶ 7.)  Firestone engineers developed and sourced the wiring

harness and made necessary components of the wiring harness that could not be acquired due to long lead times. (*Id.*)  They also designed and developed the wireless remote control for operating the Bristow Beds. (*Id.*)  The respective costs of the components and fixtures were $47,885.00 and $15,830.39, for a combined cost of $63,715.39. (Fryda Aff., p. 2, ¶ 12.)  The total cost to Firestone for engineering and design services, components, and fixtures was $318,627.71, as set forth in an October 22, 2020 invoice. (*Id.*; ECF Doc. 52-1, p. 5.)

## 2.  Order, Delivery, Inspection, and Return of Bristow Beds

On March 20, 2020, after Mr. Jacobson approved the New Prints, Mr. Bristow placed a purchase order with Firestone for five Bristow Beds at a unit price of up to $18,000 and a total price of $90,000.[1]  (Fryda Aff., p. 2, ¶¶ 13-14; ECF Doc. 52-1, p. 7 (purchase order #5003).)  Firestone produced the five Bristow Beds and issued an invoice to Mr. Bristow for $90,000. (Fryda Aff., p. 3, ¶¶ 15, 27; ECF Doc. 52-1, p. 8 (invoice).)  In his Answer, Mr. Bristow asserted that it was Big Hat, doing business as Bristow Beds, that submitted the relevant purchase order; he admitted that Firestone issued an invoice for the five beds. (Answer, p. 5, ¶¶ 32-33.)

Mr. Bristow came to Firestone's facility in Ohio to take possession of the five Bristow Beds. (Fryda Aff., p. 3, ¶ 15; Answer, p. 2, ¶ 5.)  Mr. Bristow personally inspected all five of the Bristow Beds at Firestone's facility and did not make any complaints or identify any flaws in the condition of the Beds, nor did he report that they were nonconforming. (Fryda Aff., p. 3, ¶ 16.)  The Bristow Beds were then loaded onto Mr. Bristow's truck according to his exact instructions, which were that the beds must be stacked on top of each other. (*Id.* at p. 2, ¶ 17.)  None of the

---

[1] The record indicates that Mr. Bristow also placed an earlier purchase order with Firestone for three Bristow Beds, at a unit price of up to $18,000 and a total price of $54,000, on February 29, 2020. (Fryda Aff., p. 2, ¶ 13; ECF Doc. 52-1, p. 6 (purchase order #5002).)  No relief is sought with respect to this earlier purchase order.

skids used for loading the Beds were built or provided by Firestone.  (*Id.* at p. 3, ¶ 21.)  Mr. Bristow personally strapped the beds to his truck.  (*Id.* at p. 2, ¶ 19.)

Mr. Bristow left Firestone's facility in Salem, Ohio with the Bristow Beds.  (Fryda Aff., p. 3, ¶ 22.)  When Mr. Bristow reached Alliance, Ohio, he called Firestone to report that the load had shifted.  (*Id.*)  At Mr. Bristow's request, Firestone personnel drove to Mr. Bristow and provided him with an additional skid—a skid that Mr. Bristow had left behind at Firestone's facility.  (*Id.* at ¶ 23.)  Mr. Bristow then transported the five Bristow Beds to his facility in Missouri.  (*Id.* at ¶ 24.)  Mr. Bristow admits that he transported five truck beds manufactured by Firestone from Columbiana County, Ohio to Missouri, but asserts that he did so as a representative of Big Hat.  (Answer, p. 2, ¶ 5.)

Mr. Bristow subsequently returned the five beds to Firestone without notice, and requested that Firestone make repairs at no cost to Bristow. (Fryda Aff., p. 3, ¶ 25.)  Firestone refused to repair the beds at no cost, noting that Mr. Bristow inspected the beds before he took possession and that the beds were damaged in transit after being loaded pursuant to Mr. Bristow's supervision and instruction.  (*Id.* at ¶ 26.)  Bristow admitted that the truck beds became damaged during transit and were returned to Firestone's facility.  (Answer, p. 5, ¶ 35).

Firestone issued an invoice to Mr. Bristow for $90,000.00, the cost of the five Bristow Beds (Fryda Aff., p. 3, ¶¶ 27, 28; ECF Doc. 52-1, p. 8), but Mr. Bristow has refused to pay the invoice (Fryda Aff., p. 3, ¶ 29).

### 3.    Facts Related to Mr. Bristow's Agency Status

When meeting with Firestone's president and other Firestone personnel in February 2019, and while reaching agreement that Firestone would manufacture Bristow Beds for purchase by Mr. Bristow, Mr. Bristow did not identify Big Hat as a principal in the business relationship and did not disclose that he was acting as an agent on behalf of Big Hat.  (Fryda Aff., pp. 1, 3, ¶¶ 1-3,

30.)  Mr. Bristow also did not report his agency relationship with, or the existence of, Big Hat to a Firestone engineer assigned to work exclusively on the engineering and design for the Bristow Bed.  (*Id.* at p. 1, ¶ 6; Hank Aff., p. 3, ¶ 14.)  The Prints Mr. Bristow submitted to Firestone in April 2019 do not reference Big Hat (Hank Aff., p. 1, ¶ 2; *see* ECF Doc. 52-2, pp. 4-101 (Prints); *see also* Answer, p. 3, ¶ 9 (admitting Mr. Bristow submitted "extensive prints to Firestone").

On December 18, 2019, "Bristow Beds" was registered as a fictitious name for Big Hat with the Missouri Secretary of State.  (ECF Doc. 52-3.)  The registration was filed ten months after Bristow contacted Firestone in February 2019 and seven months after he provided the Prints to Firestone in April 2019. (Fryda Aff., p. 1, ¶ 2; Hank Aff., p. 1, ¶ 2.)  The registration was also filed after the October and November emails between Mr. Bristow and Firestone's engineers regarding the New Prints, including the November email in which Mr. Bristow directed Firestone's engineers to communicate directly with Mr. Jacobson.  (*See, e.g.,* ECF Doc. 52-2, pp. 116, 120, 135, 138.)  Mr. Bristow's emails do not reference Big Hat.  (*Id.*)  The February 2020 email from Mr. Jacobson to Firestone's engineers also does not reference Big Hat, instead referencing Mr. Jacobson's "statement of work and contract *with Mr. Bristow* to essentially be a part of his technical staff" and advising that Mr. Jacobson's requests "should be considered the same as if *Mr. Bristow* is making them."  (ECF Doc. 52-2, p. 119 (emphasis added).)

The purchase orders Mr. Bristow submitted to Firestone in February and March 2020 are dated shortly after the fictitious name registration for "Bristow Beds."  (*See* Fryda Aff., p. 2, ¶¶ 13 – 14, ECF Doc. 52-1, pp. 6-7.)  But they do not reference "Big Hat," and identify "Michael Bristow" as the "Requisitioner."  (ECF Doc. 52-1, pp. 6-7.)  The letterhead used for the purchase orders has a "Bristow Beds" logo and provides for the beds to be shipped to "Bristow Beds" at an address in Missouri, with website address (http://www.BristowBeds.com).  (*Id.*)

8

The Court has not been made aware of any evidence indicating that Mr. Bristow advised Firestone of: the December 2019 fictitious name registration; Big Hat's role in as a principal in the business relationship with Firestone; or Mr. Bristow's asserted role as an agent of Big Hat in his business dealings with Firestone.[2]

In his March 15, 2023 deposition, Mr. Bristow testified that Big Hat is owned by two LLCs and "was born as a partnership to develop the product called the Bristow Bed HD-4500 and the SI-2500." (*See* ECF Doc. 52-4 ("Bristow Depo."), pp. 1 (7:14-17), 7 (35:4-16).)  Both Mr. Bristow's purchase order and Firestone's invoice for the five forklift truck beds at issue identified the truck beds by the designation "4500HD."  (ECF Doc. 52-1, pp. 6-8.)  Big Hat's ownership was shared between Bristow Investment Group, LLC ("Bristow Investment") and ATH Capital, with Mr. Bristow holding a 100% ownership interest in Bristow Investment but no interest in ATH Capital.  (*See* Bristow Depo., pp. 1 (7:14-25), 2 (9:5-20), 7 (35:4-20).)

At the time of his deposition, Mr. Bristow testified that Big Hat was still in business but had no active business operations.  (*See id.*, pp. 3-4 (9:21-10:8).)  This was because "[t]he product" was sold to a company called Humdinger Equipment, and "we"—apparently Big Hat and/or its owners—were receiving "royalties" for the product.  (*See id.*, p. 3 (10:9-19).)  Mr. Bristow confirmed that the product in question was the "HD-4500," which he said was sold to Humdinger Equipment about two years prior.  (*See id.*, pp. 8-9 (90:18-91:8).)  The identifier "4500HD" is used on the purchase orders Mr. Bristow submitted to Firestone.  (Fryda Aff., p. 2, ¶¶ 13-14; ECF Doc. 52-1, pp. 6-7.)  Mr. Bristow explained: "we ended the relationship with Firestone" "[s]oon" after the sale of the HD-4500 to Humdinger Equipment.  (Bristow Depo., p. 9 (91:9-12).)  Mr. Bristow was asked whether the "HD-4500 forklift truck beds are being sold by

---

[2] It does appear that Firestone was aware of the fictitious name registration when the initial Complaint was filed in Columbiana County Court of Common Pleas on August 6, 2021.  (ECF Doc. 1-1, p. 2, ¶ 2.)

Humdinger" and whether they are "being produced and sold based on the drawings that were submitted to Joel Jacobson" (*id.*, p. 10 (92:8-12)), and answered: "I actually don't know. So - - I haven't talked to them pretty much since then" (*id.*, p. 10 (92:17-19)).

## II. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure requires the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant therefore "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323 (1986) (internal quotations omitted).

After the moving party has carried its initial burden to show that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (internal quotations, citations, and alterations omitted). The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial. *Id.* at 587. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether summary judgment is warranted, a judge generally asks "whether there is evidence upon which a jury can properly proceed to find a

10

verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 252 (internal citations, emphasis, and bracket omitted).  If, however, "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Anderson*, 477 U.S. at 250).  The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

The fact that Mr. Bristow is proceeding pro se in this case does not impact the applicable standard of review.  "Once a case has progressed to the summary judgment stage, ... 'the liberal pleading standards under *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules of Civil Procedure] are inapplicable.'"  *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)); *see also Eslinger v. City of Kent*, No. 5:18-CV-2442, 2020 WL 1904046, at *2 (N.D. Ohio Apr. 17, 2020) (stating lenient treatment of pro se litigants does not extend to summary judgment).  This is because "liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  Accordingly, a pro se party—like any other party—cannot rely on allegations or denials in unsworn filings in opposing a motion for summary judgment.  *See Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a pro se plaintiff because he "failed to present any evidence to defeat the government's motion").

Even though Mr. Bristow has not opposed Firestone's Motion, this Court must "review carefully the portions of the record submitted by [Firestone] to determine whether a genuine

dispute of material fact exists." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 629–30 (6th Cir. 2014) (citing *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979)).  But the Court need not "search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989)).  Indeed, the Sixth Circuit cautions that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Guarino*, 980 F.2d at 406; *see also Anderson*, 477 U.S. at 249–50 (holding that the nonmoving party carries the burden to "designate specific facts or evidence in dispute").  This Court must conduct an "intelligent[] and careful[] review of the legitimacy of an unresponded-to motion," but not a *sua sponte* search of the record.  *Guarino*, 980 F.2d at 410; *see also Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Jones v. Kimberly-Clark Corp.*, 238 F.2d 399, 405 (6th Cir. 1992).

### III.    Analysis

In its Motion, Firestone argues first that there is no genuine dispute of material fact to preclude Mr. Bristow from being held individually liable under Ohio law, and argues next that summary judgment is warranted as to Counts Two (quantum meruit), Four (breach of contract), and Five (account).  For the reasons set forth below, the Court finds Mr. Bristow individually liable, **GRANTS** the Motion as to Counts Two and Four, **DENIES** the Motion as to Count Five, and disposes of Firestone's remaining claims as outlined below.

### A.    Firestone Has Established That Mr. Bristow is Subject to Individual Liability

Mr. Bristow asserted in his Answer and Motion for Judgment on the Pleadings that he cannot be held personally liable in this case because he was acting as an agent for non-party Big Hat, and did not personally do business as Bristow Beds.  (ECF Docs. 15, 18.)  Although Mr.

Bristow has not submitted evidence to support these affirmative defenses on summary judgment, Firestone—as the movant seeking to negate an affirmative defense on summary judgment—continues to "bear[] the 'initial responsibility' to 'demonstrate the absence of a genuine dispute of material fact'" as to that affirmative defense. *AMF Bruns Am., L.P. v. Vantage Mobility Int'l, L.L.C*, No. 5:23-CV-1634, 2024 WL 2803320, at *6 (N.D. Ohio May 31, 2024) (quoting *Celotex Corp.*, 477 U.S. at 323); *see Olde Town Medication & Sundries, LLC v. Feigenbaum*, No. 1:08-CV-17, 2009 WL 10679052, at *4 (S.D. Ohio Mar. 18, 2009) (finding plaintiff must show there is no dispute of material fact as to defendant's individual liability under Ohio agency law to succeed on summary judgment) (citing *Anderson*, 477 U.S. at 248).

Under Ohio law, "[a]n agent for a disclosed principal, acting within the scope of his authority and in the name of the principal, may not ordinarily be held personally liable." *Stryker Farms Exch. v. Mytczynskyj*, 129 Ohio App. 3d 338, 342, 717 N.E.2d 819 (1998) (citations omitted). This rule does not apply, however, if the agent's principal is: (1) undisclosed; (2) partially disclosed; or (3) fictitious, non-existent, or without legal capacity or status. *See Plain Dealer Publ'g Co. v. Worrell*, 2008-Ohio-4846, 178 Ohio App. 3d 485, 489, 898 N.E.2d 1009; *James G. Smith & Assocs., Inc. v. Everett*, 1 Ohio App. 3d 118, 120–121, 439 N.E.2d 932 (1981) (1981 (*"Everett"*)).

To avoid personal liability, an agent must disclose to the party with whom he is dealing (1) the agency relationship, and (2) the identity of the principal. *See Indep. Furniture Sales, Inc. v. Martin*, 2009-Ohio-5697, ¶ 11, 184 Ohio App. 3d 562, 566, 921 N.E.2d 718 (citing *Everett*, 1 Ohio App. 3d at 120-21). An agent's personal liability thus depends on whether the third parties he deals with on behalf of a principal "are aware that he is an agent of the [principal] and it is the []principal[] with which they are dealing, not the agent individually." *Everett*, 1 Ohio App. at

13

120. "The issue of whether or not an agency relationship and the identity of the principal were disclosed or known to a third party is a question of fact." *Alpha Concrete Corp. v. DiFini*, No. 48390, 1985 WL 7426, at *2 (Ohio Ct. App. Jan. 10, 1985).

Firestone argues that Mr. Bristow is subject to personal liability under Ohio law because he failed to disclose to Firestone (1) that he was acting as an agent (2) for Big Hat. (ECF Doc. 52, p. 6.) In support, Firestone notes that Mr. Bristow failed to disclose those facts to Firestone president Rick Fryda or Firestone engineer Sam Hank, who was assigned to work exclusively on the reengineering and redesigning the Bristow Bed for manufacture by Firestone. (*Id.* (citing Fryda Aff., pp. 1, 3, ¶¶ 6, 30; Hank Aff., p. 3, ¶ 14).) Firestone also notes that the Prints Mr. Bristow submitted to Firestone in April 2019 do not reference Big Hat. (*Id.* (referencing ECF Doc. 52-2, pp. 4-102).) Although "Bristow Beds" was registered as a fictitious name for Big Hat in December 2019 (ECF Doc. 52-3, p. 2), Firestone notes that the registration occurred nine months after Mr. Bristow first began business discussions with Firestone and seven months after he submitted the Prints to Firestone (ECF Doc. 52, pp. 6-7). Finally, Firestone notes that Mr. Bristow's purchase orders lacked any reference to Big Hat and identified Mr. Bristow as the "Requisitioner." (*Id.* at p. 7 (citing ECF Doc. 52-1, pp., 6, 7).)

Firestone argues that the identified evidence establishes Mr. Bristow "failed to conduct his business dealings in a manner that disclosed the identity of Big Hat [and] his agency relationship." (*Id.* at p. 7.) Further, Firestone observes that Mr. Bristow did not provide "a single example of a communication or a document indicating that he disclosed the identity of Big Hat and his agency relationship to Firestone," and did not even assert "in his Answer that he disclosed both the identity of his principal and his agency to anyone at Firestone." (*Id.* at p. 7.)

14

Viewing the evidence in the light most favorable to Mr. Bristow, the Court agrees that
Firestone has established—without any dispute of material fact—that Mr. Bristow did not tell
Firestone he was acting as an agent for Big Hat, and that Firestone did not otherwise learn Mr.
Bristow was an agent for Big Hat.  At best, the documentary evidence suggests Mr. Bristow
represented himself or an entity known as "Bristow Beds."  (*See, e.g.,* ECF Docs. 52-1, pp. 6-7
(purchase orders); 52-2, p. 116 (email from "@bristowbeds.com" address).)  Although "Bristow
Beds" was registered as a fictitious name for Big Hat in December 2019 (ECF Doc. 52-3), the
registration was ten months after Mr. Bristow began business dealings with Firestone, at a time
when Firestone's engineers were already communicating with Mr. Bristow and his engineer
regarding the New Prints.  Further, there is no evidence that Mr. Bristow made Firestone aware
of the fictitious name registration, or that the registration was otherwise known to Firestone at
any relevant time.  Thus, the evidence reflects that Mr. Bristow either failed to disclose or only
partially disclosed his agency status when he engaged with Firestone regarding the manufacture
and sale of Bristow Beds, and certainly failed to identify Big Hat as the principal.

Ohio courts have found individuals subject to personal liability in similar circumstances.
In *Everett*, the court reversed a trial court order dismissing claims against an individual who had
purportedly acted as an agent for a corporation, finding the dismissal was contrary to the law and
against the manifest weight of the evidence because the individual had only disclosed a fictitious
business name to the plaintiff and "there was no evidence that the plaintiff knew [the agent] was
acting on behalf of [the corporation]."  1 Ohio App. 3d at 120-21.  In *Huskin v. Hall*, the court
held that an agent could be held personally liable after entering a contract on behalf of a fictitious
"dba" business name if he failed to disclose the identity of the actual principal for which he was
acting as an agent.  *See Huskin*, No. 2011-T-0048, 2012 WL 553136, *3-4 (Ohio Ct. App. Feb.

21, 2012). And in *Re/Max Crossroads Properties v. Roberts*, the court upheld claims for personal liability where an individual entered an agreement under a dba business name while purporting to act on behalf of a different, not-yet-incorporated entity. *See Re/Max Crossroads Properties*, 2013-Ohio-5575, 2013 WL 6730799, *3-4 (Ohio Ct. App. December 19, 2013).

The cases cited by Mr. Bristow in his prior Motion for Judgment on the Pleadings do not change the analysis. Although the court in *Plain Dealer* found personal liability unsupported where an agent disclosed a fictitious trade name rather than the actual business name, the court focused its analysis on the fourth category of Ohio's agency standard—whether an agent was acting for "a fictitious or nonexistent principal"—rather than the "partial disclosure" standard at issue here, finding the agent was not acting on behalf of a fictitious *entity* but only providing a fictitious *name*. 178 Ohio App. 3d at 491. Other courts following *Plain Dealer* have focused on evidence that the individual's agency status was clear and the difference between the fictitious name given and the actual business name was minimal. *See, e.g., M. Steel, Inc. v. Seltzer*, No. 95336, 2011 WL 2112682 (Ohio Ct. App. 2011) (finding evidence strongly indicated plaintiff was on notice that it was dealing with the entity "Parkshill Steel Corp." when all billings and account information were in the name "Parks Hill Steel"); *VP Consol. Holdings, Inc. v. Hunt*, No. E-08-025, 2009 WL 641427 (Ohio Ct. App. 2009) (finding "mere use of 'HCI' instead of 'HCCI'" did not render agent personally liable where plaintiff knew the agent was the president of a company operating for the purposes at issue and nothing in the record suggested use of name HCI was an attempt to hide the identity of HCCI).

Here, in contrast, no evidence has been presented to show that Mr. Bristow informed or otherwise intimated to Firestone that he was acting as an agent for any organized business entity. While his use of the trade name "Bristow Beds" could suggest that he was acting as an agent for

a business entity, it was equally possible for him to have used such a trade name as a dba for himself, acting in his individual capacity.  He did not advise Firestone that "Bristow Beds" had been registered as a fictitious name for Big Hat or that he was acting as an agent for Big Hat. Given the lack of direct evidence that Mr. Bristow disclosed to Firestone that he was acting as an agent for any business entity, and the lack of any evidence that he disclosed he was acting as an agent for Big Hat, the Court finds Firestone has established, based on the undisputed facts, that Mr. Bristow is subject to individual liability due to his failure to advise Firestone that he was acting as an agent for Big Hat in his business dealings with Firestone.  The Court will therefore turn to the requests for summary judgment on Counts Two, Four, and Five of the Complaint.

**B.**      **Firestone is Entitled to Recovery for its Engineering and Design Work**

Firestone argues that it is entitled to summary judgment on the quantum meruit claim set forth in Count Two of the Complaint.  (ECF Doc. 52, pp. 8-13.)  Specifically, Firestone argues that it is "entitled to summary judgment against [Mr.] Bristow for its claim in quantum meruit because [Mr.] Bristow was fully aware of the reengineering and design work being done by Firestone and retained the benefit of those services without payment to Firestone under circumstances that are unjust."  (ECF Doc. 52, p. 8 (bold omitted).)

Firestone notes that its claim for "quantum meruit" is closely related to, but distinct from, a claim for "unjust enrichment," explaining that it is seeking relief in quantum meruit because the measure of damages in quantum meruit is the value of services and Firestone seeks to recover the reasonable value of its engineering and design services.  (*Id.*)  Firestone has filed claims for equitable relief under both quantum meruit and unjust enrichment theories, in Counts Two and Three of the Complaint.  (Complaint, pp. 3-4, ¶¶ 20-30.)  For the reasons set forth below, the Court merges the claims in Counts Two (quantum meruit) and Three (unjust enrichment), and **GRANTS** Firestone's Motion for relief under the quantum meruit standard in Count Two.

17

### 1.    Legal Standard and Merger of Counts Two and Three

If there is no enforceable contract, a party may be entitled to recovery under a quasi-contract theory. *J. Bowers Constr. Co. v. Gilbert*, 2014-Ohio-3576, ¶ 9, 18 N.E.3d 770, 774 (citations omitted). "Recovery in quasi-contract prevents the defendant from unjustly enriching himself at the expense of the plaintiff." *Bokar v. Lax*, No. 2630-M, 1997 WL 557333, at *2 (Ohio Ct. App. Sept. 3, 1997) (citations omitted). "An example of a quasi-contract claim is quantum meruit." *J. Bowers Constr. Co*., 18 N.E.3d at 774.

Under Ohio law, "quantum meruit" and "unjust enrichment" are two quasi-contract theories for equitable relief that share a three-part test: "(1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be unjust to permit the defendant to retain the benefit without payment." *Grassi v. Grassi*, No. 20-3358, 2021 WL 3355475, at *5 (6th Cir. Aug. 3, 2021) (*citing Meyer v. Chieffo*, 193 Ohio App. 3d 51, 950 N.E.2d 1027, 1039 (2011); *Hambleton v. R.G. Barry Corp*., 12 Ohio St.3d 179, 465 N.E.2d 1298, 1302 (1984)). The distinction between the theories, to the extent courts recognize a difference, lies in the calculation of damages: damages for quantum meruit are generally measured by the value of the services, while damages for unjust enrichment are measured by a quantifiable benefit to the recipient. *See Grassi*, 2021 WL 3355475 at *5; *Reisenfeld & Co. v. Network Grp., Inc*., 277 F.3d 856, 863 n.1 (6th Cir. 2002) (*citing Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co*., 46 Ohio St.3d 51, 544 N.E.2d 920, 924 (Ohio 1989) ("*Quantum meruit* is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered.") (italics in original)).

Because the claims asserted by Firestone in Counts Two (quantum meruit) and Three (unjust enrichment) of the Complaint both seek equitable, quasi-contract relief for the same engineering and design services (Complaint, pp. 3-4, ¶¶ 20-30), and are subject to the same legal

18

standard, the Court hereby merges the claims in Counts Two and Three,[3] and proceeds to consider Firestone's Motion under the quantum meruit damages standard in Count Two.

### 2.    Mr. Bristow is Liable for Damages Under a Quantum Meruit Theory

In its Motion, Firestone avers that there is no genuine issue of material fact as to whether it conferred the benefit of the engineering and design services that led to the development of the New Prints on Mr. Bristow, that Mr. Bristow knew of the benefit, and that it would be unjust to allow Mr. Bristow to retain the benefit of Firestone's services without payment.  (ECF Doc. 52, pp. 5-8.)  Having reviewed Firestone's arguments and evidence in support thereof, the Court finds the following facts to be undisputed:

- Mr. Bristow and Firestone reached an agreement for Firestone to manufacture custom forklift truck beds called "Bristow Beds" for Mr. Bristow.  (Fryda Aff., p. 1, ¶¶ 1-3.)

- Mr. Bristow provided design plans ("Prints") and a prototype to Firestone, but the Bristow Beds could not be produced from the Prints and the prototype was not a final production unit.  (*Id.* at p. 1, ¶¶ 4-5; Hank Aff., pp. 1-2, ¶¶ 2-5.)

- Firestone's engineers redesigned and reengineered the custom forklift truck bed depicted in the Prints, creating a design and prototype with almost no parts that were identical to Mr. Bristow's original prototype.  Without this redesign and reengineering, it would not be possible for the lift assembly depicted in the Prints to function correctly, or at all.  (Hank Aff., pp. 2-3, ¶¶ 6-10.)

- Once Firestone built a functional prototype, it produced a complete set of prints ("New Prints") based on that prototype from which a fully functional Bristow Bed could be manufactured.  (*Id.* at pp. 2-3, ¶¶ 7-11; Fryda Aff., p. 1, ¶¶ 8-9.)

- Mr. Bristow was in constant contact with Firestone's engineers regarding the engineering and design work being done in service of manufacturing the Bristow Bed.  (Hank Aff., p. 3, ¶¶ 12-13; ECF Doc. 52-2, pp. 120-143.)

- Mr. Bristow received a copy of the New Prints, directed Firestone to send the New Prints to professional engineer Joel Jacobson for approval, and instructed

---

[3] *See Jasar Recycling, Inc. v. Major Max Mgmt. Corp.*, No. 4:08CV2830, 2010 WL 395212, at *7 (N.D. Ohio Jan. 22, 2010) (merging unjust enrichment and quantum meruit claims); *U.S. Health Pracs., Inc. v. Byron Blake, M.D., Inc.*, No. 00AP-1002, 2001 WL 277291, at *2 (Ohio Ct. App. Mar. 22, 2001) (stating that claims for quantum meruit and unjust enrichment comprise a single cause of action under two damages theories).

Firestone's engineers to communicate directly with Mr. Jacobson. (Fryda Aff., p. 2, ¶¶ 10-11; Hank Aff., p. 3, ¶¶ 12-13; ECF Doc. 52-2, pp. 116-18.)

- Mr. Jacobson advised Firestone's engineers that he was essentially a part of Mr. Bristow's staff and that requests from Mr. Jacobson should be considered the same as if Mr. Bristow was making the requests. (Hank Aff., p. 3, ¶ 12; ECF Doc. 52-2, p. 119.)

- Upon receiving a copy of the New Prints, which contained Firestone's signature block, Mr. Jacobson required Firestone to remove the signature block, stating that he could not sign off on the prints if they contained Firestone's signature block. (Fryda Aff., p. 2, ¶ 11; Hank Aff., p. 3, ¶ 12.)

- The New Prints were the result of 3016 hours of design and engineering work by Firestone's engineers, whose customary hourly rate is $84.52. (Fryda Aff., p. 2, ¶ 12.) The total value of Firestone's engineering and design work on the New Prints was therefore $254,912.32. (*Id.*; ECF Doc. 52-1, p. 5.)

- Mr. Bristow's purchase orders for Bristow Beds manufactured by Firestone identified the forklift truck beds using the designation "4500HD." (ECF Doc. 52-1, pp. 6-7.) Firestone's invoice used the same designation. (*Id.* at p. 8.)

- In his March 2023 deposition, Mr. Bristow testified that Big Hat had sold the "HD-4500" to Humdinger Equipment about two years before, and that Big Hat had ended its business relationship with Firestone soon after that sale. (Bristow Depo., pp. 3 (10:9-19), 8-9 (90:18-91:12).)

- Mr. Bristow held a 100% ownership interest in one of the two LLCs that owed Big Hat and was still receiving "royalties" for the HD-4500 at the time of his deposition. (*Id.* at pp. 1 (7:14-25), 2 (9:5-10), 3 (10:9-19), 7 (35:4-20).)

- When asked whether the HD-4500 forklift truck beds currently being produced and sold by Humdinger were produced and sold based on the New Prints, Mr. Bristow answered that he did not know and had not talked to Humdinger Equipment since the sale of the HD-4500. (*Id.*, p. 10 (92:8-19).)

Turning to the first element of Firestone's quantum meruit claim, the Court finds that

Firestone "conferred a benefit" on Mr. Bristow when its engineers developed the New Prints.

*Grassi*, 2021 WL 3355475, at *5. The undisputed facts establish that it was not possible to

manufacture a functional Bristow Bed based the Prints and prototype supplied by Mr. Bristow,

but that the New Prints developed by Firestone made it possible to manufacture a functional

Bristow Bed. Further, the undisputed facts establish that Big Hat sold the right to manufacture

20

and sell Bristow Beds to Humdinger Equipment shortly before terminating its business relationship with Firestone, and that Mr. Bristow and others continued to receive royalties on Humdinger Equipment's ongoing sales of Bristow Beds two years later.

Turning to the second element of Firestone's quantum meruit claim, the Court finds that Mr. Bristow "knew of the benefit" Firestone had conferred on him. *Id.* The undisputed facts show that Mr. Bristow was in constant contact with Firestone's engineers during the redesign of the Bristow Bed and directed those engineers to communicate directly with his own engineer regarding the New Prints. Further, his deposition testimony showed his personal knowledge of the sale of the HD-4500 product to Humdinger Equipment, his knowledge that Big Hat's business relationship with Firestone was terminated soon after that sale, and that he continued to receive royalties based on ongoing sales of the HD-4500 during the pendency of this suit.

As to the third element, the Court finds "it would be unjust to permit [Mr. Bristow] to retain the benefit without payment." *Id.* The undisputed facts establish that Mr. Bristow did not have design drawings from which a functional Bristow Bed could be manufactured when he entered an agreement for Firestone to manufacture Bristow Beds, that Firestone's engineers played a material role in developing the design drawings needed to manufacture a functional Bristow Bed, and that Mr. Bristow's engineer directed Firestone to remove its signature block from the completed design drawings before the product was sold to Humdinger Equipment. While Mr. Bristow is entitled to royalties on future sales of Bristow Beds pursuant to the sale agreement with Humdinger Equipment, Firestone did not receive any renumeration or benefit for its role in developing the New Prints necessary to manufacture a functional Bristow Bed.[4]

---

[4] Mr. Bristow's testimony that he did not know if Humdinger Equipment was using the New Prints to manufacture Bristow Beds (Bristow Depo., p. 10 (92:8-19)) does not alter this analysis, since the undisputed evidence establishes it was not possible to manufacture a Bristow Bed using Mr. Bristow's Prints, and the redesign and reengineering documented in the New Prints was necessary to manufacture functional Bristow Bed.

In light of the undisputed facts, the Court concludes that no reasonable jury could find Firestone has not met its burden to show that is conferred a benefit, known to Bristow, that would be unjust for Bristow to retain without payment.  The Court further finds that the uncontested evidence regarding Firestone's engineering and design services is sufficient to establish that the value of Firestone's services amounted to $254,912.32.  (Fryda Aff., p. 2, ¶12; ECF Doc. 52-1, p. 5.)  *See Auto Chem Lab'ys, Inc. v. Turtle Wax, Inc*., No. 3:07CV156, 2010 WL 3769209, at *8 (S.D. Ohio Sept. 24, 2010) (applying Ohio law) (citations omitted) (holding that recovery for quantum meruit is limited to the actual value of services rendered).

For the reasons set forth above, the Court **GRANTS** Firestone's motion for summary judgment on the quantum meruit claim in Count Two of the Complaint, and awards damages in the amount of $254,912.32.

### 3.    Alternative Claim for Engineering and Design Service Fees is Dismissed

In addition to the quasi-contract claims for equitable relief articulated in Counts Two and Three of the Complaint, Firestone asserts a breach of contract claim in Count One that seeks recovery for the same engineering and design services.  (*See* ECF Doc. 14, pp. 2-4, ¶¶ 8-30.) The Court construes this claim as having been pleaded in the alternative.  *See Childers Redimix & Constr. Supply Inc. v. Concrete Plants, Inc*., No. 5:21-CV-2150, 2022 WL 2666293, at *3 (N.D. Ohio July 11, 2022) (citations omitted) (holding that "essential character" of claims is that of claims pleaded in the alternative because recovery on more than one is impermissible, regardless of the form of the pleadings); *Vinyl Kraft Acquisition, LLC v. RHI, Inc*., No. 1:22-CV-271, 2022 WL 4779918, at *7 (S.D. Ohio Oct. 3, 2022).

While it is proper to plead claims in the alternative, an enforceable contract is legally inconsistent with quasi-contract.  *See, e.g.*, *Ice v. Hobby Lobby Stores, Inc*., No. 1:14CV744, 2016 WL 10489843, at *2 (N.D. Ohio Aug. 30, 2016); *Compound Prop. Mgmt., LLC v. Build*

*Realty, Inc*., 462 F. Supp. 3d 839, 867-68 (S.D. Ohio 2020).  Moreover, Firestone is not entitled

to double recovery.  *See EEOC v. Waffle House, Inc*., 534 U.S. 279, 297, (2002) ("[It] goes

without saying that courts can and should preclude double recovery."); *Son v. Coal Equity*, *Inc*.,

122 F. App'x 797, 802 (6th Cir. 2004).

Accordingly, the Court **DISMISSES** the breach of contract claim set forth in Count One

of the Complaint (ECF Doc. 14, pp. 2-3, ¶¶ 8-19) as moot.[5]

## C.     **Firestone is Entitled to Recover Contract Price for Five Custom Truck Beds**

Firestone next argues that it is entitled to summary judgment on the breach of contract

claim set forth in Count Four of the Complaint.  (ECF Doc. 52, pp. 13-15.)  Specifically,

Firestone argues that it is entitled to the $90,000.00 invoiced amount for the sale of five custom

truck beds because Mr. Bristow accepted the truck beds without any notice of nonconformance,

admitted that the beds were damaged en route to Missouri, and failed to pay for those accepted

goods at the contract price.  (*Id.* at pp. 13-14.)

### 1.     **Legal Standard**

Firestone's breach of contract claim is brought under the Ohio Commercial Code

("OCC").  (ECF Doc. 52, p. 13.)  "In Ohio, the Uniform Commercial Code, as codified by the

Ohio Commercial Code, governs contracts for the sale of goods." *Energy Mktg. Servs., Inc. v.*

*Homer Laughlin China Co*., 186 F.R.D. 369, 374 (S.D. Ohio 1999), *aff'd*, 229 F.3d 1151 (6th

Cir. 2000).  Specifically, Firestone alleges that Bristow breached a sale of goods contract

because Bristow accepted the goods, pursuant to Ohio Rev. Code Ann. § 1302.64(A)(1), but

---

[5] *See Patel Strategic Gro., L.L.C.*, 2020-Ohio-4990, ¶¶ 41-46, 161 N.E.3d 42, 45 (Ohio Ct. App. 2020) (once
liability on breach of contract claim established, court could not consider arguments for claim in the alternative
thereby rendering such claim moot).

failed to pay for those accepted goods at the contract price, pursuant to Ohio Rev. Code Ann. §

1302.65.  (ECF Doc. 52, p. 13.)  The statutes provide, in pertinent part:

**§ 1302.64 What constitutes acceptance of goods**

(A) Acceptance of goods occurs when the buyer:

(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(2) fails to make an effective rejection as provided in division (A) of section 1302.61 of the Revised Code, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

(B) Acceptance of a part of any commercial unit is acceptance of that entire unit.

**§ 1302.65 Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over**

(A) The buyer must pay at the contract rate for any goods accepted.

(B) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by sections 1302.01 to 1302.98, inclusive, of the Revised Code for non-conformity.

(C) Where a tender has been accepted:

(1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; . . . .

(D) The burden is on the buyer to establish any breach with respect to the goods accepted.
            . . . .

OHIO REV. CODE ANN. § 1302.64-65.

### 2.     Mr. Bristow is Liable for Breach of Contract as to the Five Truck Beds

Firestone argues that there is no genuine dispute of material fact as to whether Mr.

Bristow is liable for breach of contract in the contracted amount of $90,000.  (ECF Doc. 52, pp.

13-15.)  Having reviewed Firestone's arguments and evidence in support thereof, the Court finds

the following facts to be undisputed.

- Mr. Bristow placed a March 31, 2020 purchase order with Firestone for five 4500HD forklift truck beds at a unit price of "[u]p to $18,000" and a total price of $90,000.  (ECF Doc. 52-1, p. 7.)

- Mr. Bristow was listed as the "Requisitioner," the F.O.B. was Salem, OH, and the shipping terms stated: "Do not ship without inspection."  (*Id.*)

- Mr. Bristow personally picked up the five truck beds from Firestone's facility in Salem, Ohio.  (Fryda Aff., pp. 2-3, ¶ 15-21.)

- Mr. Bristow personally inspected the five truck beds, had them loaded under his instruction and supervision, personally strapped the beds down, and drove the beds off Firestone's property.  (*Id.* at ¶ 16-21.)

- Later, Mr. Bristow called Firestone from Alliance, Ohio, stating that he was having problems with the load shifting.  (*Id.* at p. 3, ¶¶ 22, 25.)

- Firestone personnel brought Mr. Bristow a skid he had left behind at Firestone's facility, and Mr. Bristow continued traveling to his facility in Missouri.  (*Id.* at ¶¶ 23-24.)

- Mr. Bristow later returned the five beds to Firestone without notice and requested that Firestone make repairs at no cost. (*Id.* at ¶ 25.)

- Firestone refused because Mr. Bristow had inspected the beds before he took possession, and they were damaged in transit after being loaded pursuant to Mr. Bristow's own supervision and instruction.  (*Id.* at ¶ 26.)

- Firestone issued an invoice to Mr. Bristow for $90,000.00, the contract price (*id.* at ¶¶ 27, 28), but Mr. Bristow has refused to pay (*id.* at ¶ 29).

Considering these undisputed facts, the Court finds that Firestone has proven that Mr.

Bristow ordered the five truck beds at an agreed total price of $90,000, failed to make an

effective rejection of the five truck beds after having a reasonable opportunity to inspect them,

and therefore accepted the goods as contemplated in OHIO REV. CODE ANN. § 1302.64(A)(2). Once he accepted the truck beds, the burden was on Mr. Bristow to establish a breach, which he did not do.  OHIO REV. CODE ANN. § 1302.65(D).  On the contrary, both Mr. Bristow and Firestone agreed that the truck beds were damaged in transit.  (ECF Doc. 15, p. 5, ¶ 35; Fryda Aff., p. 3, ¶ 26.)  Based on these findings, Bristow owes Firestone the contract rate of $18,000.00 per truck bed, for a total of $90,000.  OHIO REV. CODE ANN. § 1302.65(A).

In light of the undisputed facts, the Court concludes that no reasonable jury could find Firestone has not met its burden to prove that Mr. Bristow is liable for breach of contract in the amount of $90,000.  Accordingly, the Court **GRANTS** Firestone's motion for summary judgment on the breach of contract claim in Count Four of the Complaint, and awards damages in the amount of $90,000.

## D.    Alternative Claim for Unpaid Account

Firestone's final argument on summary judgment is that Mr. Bristow is "personally liable to Firestone on an unpaid account in the sum of $90,000.00" under Count Five of the Complaint because Mr. Bristow "personally ordered products from Firestone and refuses to pay Firestone for them."  (ECF Doc. 52, p. 15 (bold omitted).)  This cause of action pertains to the same $90,000 invoice for custom truck beds that was the subject of the breach of contract claim in Count Four.  (*Compare* Complaint, pp. 4-5, ¶¶ 31-38 *with id.*, at p. 5, ¶¶ 39-40.)

Where an account claim seeks identical damages to a breach of contract claim, these claims may be construed as pleaded in the alternative.  *Vinyl Kraft Acquisition, LLC*, 2022 WL 4779918, at *7.  "An action on an account is not a separate claim but, rather, a pleading device used to consolidate several claims which one party has against another."  *Digitalight Sys., Inc. v. Cleveland Clinic Found.*, 2022-Ohio-1400, ¶¶ 73-75, 188 N.E.3d 1151, 1165–66 (Ohio 2022) (internal quotation marks omitted).  "The purpose of an action on an account is to avoid the

multiplicity of suits necessary if each transaction between the parties (or item on the account) would be construed as constituting a separate cause of action." *Vinyl Kraft Acquisition, LLC*, 2022 WL 4779918, at *7 (citing *Johncol, Inc. v. Cardinal Concession Servs., L.L.C.*, 101 N.E.3d 1014, 1020 (Ohio Ct. App. 2014) (*quoting Citibank v. Hyslop*, No. 12AP-885, 2014 WL 890942, at *2 (Ohio Ct. App. Mar. 6, 2014)).

Because the account claim is duplicative in this case, *see Vinyl Kraft Acquisition, LLC*, 2022 WL 4779918, at *7; *Digitalight Systems, Inc.*, 188 N.E.3d at 1165–66, and moreover would result in impermissible double recovery on a contract claim, *see E.E.O.C.*, 534 U.S. at 297, the Court **DENIES** Firestone's motion for summary judgment on the claim for unpaid account in Count Five and **DISMISSES** Count Five (Complaint, p. 5, ¶¶ 39-40) as moot.

### IV.	Conclusion

For the reasons set forth above, the Court: (1) finds Mr. Bristow individually liable; (2) merges the quantum meruit claim in Count Two with the unjust enrichment claim in Count Three and **GRANTS** Firestone's Motion for Summary Judgment as to Count Two, awarding damages of **$254,912.32**; (3) **GRANTS** Firestone's Motion for Summary Judgment as to the breach of contract claim in Count Four, awarding damages of **$90,000**; (4) **DENIES** Firestone's Motion for Summary Judgment as to Count Five; (5) **DISMISSES** all remaining claims as moot. Accordingly, Mr. Bristow is individually liable for a total damage award of **$344,912.32**.

IT IS SO ORDERED.

Dated: August 14, 2024

  /s/ Amanda M. Knapp
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

27